IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**BRIDGET BECKFORD**

        **Plaintiff,**

   v.                                 **Civil Action No. 3:23cv828**

**ELEVANCE HEALTH, INC.,**

        **Defendant.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Defendant Elevance Health, Inc.'s ( "Anthem"[1])
Amended Motion for Summary Judgment (the "Motion").[2]  (ECF No. 49.)  Bridget Beckford
responded in opposition, (ECF No. 51), and Anthem replied, (ECF No. 52).

The matter is ripe for disposition.  The Court dispenses with oral argument because the
materials before it adequately present the facts and legal contentions, and argument would not
aid in the decisional process.

For the reasons articulated below, the Court will grant the Amended Motion for Summary
Judgment and will dismiss this action.  (ECF No. 49.)

---

[1] Because Elevance Health, Inc. was known as "Anthem, Inc." during Ms. Beckford's
employment and because it predominately refers to itself as "Anthem" throughout its summary
judgment briefing, (*see* ECF No. 50, at 6 n.1; ECF No. 52, at 2 n.1), the Court will refer to
Elevance Health, Inc. as "Anthem" throughout this Memorandum Opinion.

[2] The Court employs the pagination assigned by the CM/ECF docketing system.

# I.  Factual and Procedural Background

A.    **Undisputed Factual Background[3]**

1.    **Ms. Beckford Joins Anthem as a Group Underwriter II**

From May 6, 2019 through March 12, 2021, Ms. Beckford, a Black woman, worked under Maria Gregory as an underwriter on Anthem's Virginia Key Accounts team ("Job No. 1"). (ECF No. 50-1 ("Gregory Decl.") ¶¶ 3–4, 6; ECF No. 1-1, at 66 ¶ 16.)  Ms. Beckford's title during this time period was "Group Underwriter II."  (Gregory Decl. ¶ 6 (internal quotation marks omitted).)

Ms. Gregory hired Ms. Beckford and served as her only manager for Job No. 1.  (Gregory Decl. ¶¶ 3–5; ECF No. 52-1 ("Second Gregory Decl.") ¶ 3.)  Ms. Gregory first "conducted a screening interview with [Ms. Beckford], and then arranged for her to go through a panel interview with three individuals who would be her coworkers."  (Second Gregory Decl. ¶ 3.) Although these three individuals gave Ms. Gregory "feedback on Ms. Beckford and the other final candidate", Ms. Gregory "alone made the decision to hire [her]."[4]  (Second Gregory Decl. ¶¶ 3–4.

---

[3] When considering a motion for summary judgment, a court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995).

[4] Ms. Gregory was never asked in her deposition if she was the sole decision maker regarding Ms. Beckford's hiring. (*See* ECF No. 51-1, at 52–55 ("Gregory Dep.").)  In her declaration, Kim Williams states that she was on the interview panel that selected Ms. Beckford. *See* ECF No. 51-1, at 157, ¶ 6 ("Williams Decl.").  This falls short of contradicting the finding that Ms. Gregory was the sole decision maker regarding Ms. Beckford's hiring.  Therefore, there is no genuine dispute of material fact as to this issue.

While working in Job No. 1, Ms. Beckford served as one of two underwriters on the

Virginia Key Accounts team. (Gregory Decl. ¶ 7.) The other underwriter, Pam Ayers, held the

job title "Group Underwriter, Senior" and had approximately twelve years of experience when

Ms. Beckford joined the team. (Gregory Decl. ¶¶ 7–8.) Before Ms. Beckford joined Anthem as

an underwriter, Ms. Ayers had "performed the underwriting responsibilities for the entire state of

Virginia for a period of approximately four months, on her own." (Gregory Decl. ¶ 8.) Due to

Ms. Ayers's seniority, Ms. Gregory selected Ms. Ayers to train Ms. Beckford when she joined

the Virginia Key Accounts team. (Gregory Decl. ¶ 7.) Both Ms. Ayers and Ms. Beckford were

"responsible for underwriting for new and renewal customers" (Gregory Decl. ¶ 7.) Because

Ms. Ayers was more senior, she also represented the Virginia Key Accounts team in "enterprise-

wide calls/meetings." (Gregory Decl. ¶ 7.)

### 2. Ms. Beckford Raises Concerns about Ms. Ayers's Racially-Motivated Actions

Approximately nine months later, on January 31, 2020, Ms. Beckford reported to Ms.

Gregory that Ms. Ayers "used inappropriate language in her presence", and "indicated that one

of the comments was racial in nature and was extremely serious." (Gregory Decl. ¶ 11.) In

response, on February 2, 2020, Ms. Gregory "filed a formal concern on behalf of Ms. Beckford

with Anthem's Ethics & Compliance department and Anthem's Associate Relations

department." (Gregory Decl. ¶ 12; Gregory Decl. Ex. 3; ECF No. 50-2 ("Pl. Dep." or "Pl. Dep.

First Excerpt"), at 74:19–75:22.) A few days later, "an investigator with Associate Relations",

Bennie Jackson, informed Ms. Gregory that "he would be investigating the concern." (Gregory

Decl. ¶ 12.) Ms. Gregory's February 2, 2020 was assigned the incident number "IM 1169057"

(the "First Investigation"). (ECF No. 50-3 ("Thompson Decl.") ¶ 5; *see also* Thompson Decl.

Ex. 1, at 1.) On February 21, 2020, while the First Investigation remained ongoing, Ms.

3

Beckford requested to move her cubicle away from Ms. Ayers; Ms. Gregory "immediately approved" this request. (Gregory Decl. ¶ 13; Gregory Decl. Ex. 5, at 1.)

The investigation file for the First Investigation includes Ms. Beckford's allegations that Ms. Ayers[5] "said derogatory things about African Americans, using the N word specifically", and that she "drew a picture of a person with a frown with brown markers" and stated that the person "'looks like a n****r'".[6] (Thompson Decl. Ex. 1, at 2.) The investigation file also includes Ms. Beckford's allegations that Ms. Ayers stated on Martin Luther King Day that "she has a Confederate Flag . . . at home", and on a different occasion Ms. Ayers remarked that "Hispanics and Mexicans . . . 'are leeching off the system, and we are paying taxes for them to be here.'" (Thompson Decl. Ex. 1, at 2.) Mr. Jackson was unable to substantiate any of Ms. Beckford's claims, with the possible exception that Ms. Ayers made one derogatory comment regarding Mexican and Hispanic people. (*See* Thompson Decl. ¶ 8; Thompson Decl. Ex. 1, at 1–2.)[7] The First Investigation ended on approximately March 9, 2020, with Mr. Jackson noting

---

[5] The investigation file for IM 1169057 at times refers to Ms. Ayers as "Myers." (*See* Thompson Decl. Ex. 1, at 2.) Considering this document as a whole, the Court construes references to "Myers" to be a scrivener's error, and that these references are in fact to Ms. Ayers.

[6] Ms. Beckford contends that Ms. Gregory never reported the use of this specific racial epithet for investigation. (*See, e.g.*, ECF No. 51, at 3.) The record, however, demonstrates that Ms. Gregory did not know the actual words when she reported the incident.

In the report documenting the relevant complaint, Incident Report IM1169057, Mr. Jackson opens his file by recording that Ms. Gregory wrote that Ms. Ayers is "condescending," would not "share workload," or help Ms. Beckford learn the job despite being her "trainer/teacher." (Thompson Decl. Ex. 1, at 1.) Ms. Gregory also reported that "Bridget also said that Pam uses language that is not appropriate in the workplace, but Bridget will not tell [her] that actual language used, for fear that Pam will retaliate against [Ms. Beckford]." (Thompson Decl. Ex. 1, at 1.)

[7] Mr. Jackson writes in the investigation file that "[w]ith no witness collaboration or any physical evidence", he "could not substantiate" *any* of Ms. Beckford's claims. (Thompson Decl. Ex. 1, at 2.) Inconsistently, in her Declaration, Anthem's Director of HR Service Delivery Lydia

that "Manager Gregory is going to do a Diversity and Inclusion training with the entire team and a coaching/Initial warning for [Ms. Ayers]. Nothing further from [Associate Relations Consultants]." (Thompson Decl. Ex. 1, at 2.) On March 13, 2020, Anthem directed all of its employees to work from home due to Covid. (Gregory Decl. ¶ 15.) After this date, "Ms. Beckford and Ms. Ayers never interacted in person again." (Gregory Decl. ¶ 15.)

At approximately the same time the First Investigation was ending in early March 2020, Ms. Gregory "learned that Ms. Ayers had apparently talked to two other employees (Bonnie Taylor and Kim Williams) about the investigation." (Gregory Decl. ¶ 16.) Ms. Gregory then filed a second formal complaint with Anthem's Associate Relations department out of concern that Ms. Ayers was retaliating against Ms. Beckford in response to the First Investigation. (Gregory Decl. ¶ 16; Gregory Decl. Ex. 7, at 1; Pl. Dep. at 142:9–144:9.) Ms. Gregory's second complaint was assigned the case number "IM 1175085" (the "Second Investigation"). (Gregory Decl. Ex. 7, at 1.) On May 1, 2020, Mr. Jackson wrote an email to Ms. Gregory regarding the results of the Second Investigation. (Gregory Decl. Ex. 8, at 1.) Mr. Jackson wrote that he "spoke with both Kim Williams and Bonnie Taylor" and concluded that that "nothing in their statements . . . leads to evidence of retaliation or interference with an investigation." (Gregory Decl. Ex. 8, at 1; *see also* Thompson Decl. ¶ 9.)

---

Thompson writes that for investigation IM 1169057, Mr. Jackson was able to substantiate "a single derogatory comment by Ms. Ayers about Mexicans and Hispanics." (Thompson Decl. ¶ 8.) This inconsistency is immaterial, and the Court presumes the statement was made and considered by HR.

As later explained, Ms. Beckford fails to establish a prima facie case of race discrimination or retaliation. *See* Sections III.A–B. The question of whether Mr. Jackson substantiated the claim that Ms. Ayers made this specific derogatory comment is not relevant to either analysis. *See* Sections III.A–B. The Court's analysis regarding Ms. Beckford's FMLA interference claim also does not rely in any on way on this question. *See* Section III.C.

5

After the First and Second Investigations had concluded, Ms. Beckford continued to raise

concerns "that Ms. Ayers had harassed, bullied, and sabotaged her." (Gregory Decl. ¶ 17.)  In

August 2020, Ms. Beckford submitted a formal complaint with Associate Relations regarding

Ms. Ayers, writing that she has "been verbally harassed, bullied, [and] had to endure racial slurs

over the past year while working in a hostile environment." (Thompson Decl. Ex. 3, at 1.)  Ms.

Beckford wrote that "there seems to be some type of sabotage from" Ms. Ayers and that "[s]he

seems to have a need to constantly control what I do and I would like for it to end and follow the

chain of command." (Thompson Decl. Ex. 3, at 1.)  In response to this complaint, Associate

Relations held a mediation that same month "with Ms. Beckford and Ms. Ayers" that Ms.

Gregory also attended. (Gregory Decl. ¶ 20.)  Ms. Gregory also directed both employees to

include Kim Williams, the Business Change Manager, "on any communications with each

other." (Gregory Decl. ¶ 19.)

### 3.    Ms. Beckford Maintains a Positive Relationship With Ms. Gregory Throughout Her Time on the Virginia Accounts Team

Ms. Beckford acknowledges that during her time on the Virginia Key Accounts Team,

Ms. Gregory supported her by filing two complaints on her behalf and by trying to find solutions

to her conflict with Ms. Ayers. (Pl. Dep., at 131:8–14; 141:6–13; 159:1–13; 160:8–21.)  She also

recognizes that Ms. Gregory was "a good manager to [her]." (Pl. Dep., at 284:18–19.)  For

example, in a March 11, 2020 email from Ms. Beckford to Ms. Gregory, Ms. Beckford wrote:

"You have been so wonderful during this entire ordeal and you are not only a good person but a

great leader." (Pl. Dep. Ex. 18, at 2.)  In response, Ms. Gregory wrote:

> I absolutely want to support you to find the best role/team here at Anthem – even
> if that means it's not on my team. . . .  If I hear of any open positions, I will pass
> them along to you.  And I wish you nothing but the best and future success. I hope
> it's here with me, but I will support you either way.

(Pl. Dep. Ex. 18, at 1.)  Approximately six months later, on September 23, 2020, Ms.

Beckford emailed Ms. Gregory letting her know that she was considering interviewing

with a different team at Anthem, and asking for her assistance.  (Pl. Dep., at 159:15–

160:21; Pl. Dep. Ex. 22, at 2.)  In response, Ms. Gregory wrote that although she "would

be very sad" if Ms. Beckford left her team, she was nonetheless "happy to help in any

way" and offered to conduct a mock interview.  (Pl. Dep. Ex. 22, at 2.)  Ms. Beckford

replied warmly, restating her positive opinion of Ms. Gregory:

> Maria, I really enjoy working with most of my team and I love having you as a
> leader.  I would follow you wherever you decided to go because I do see that you
> have great leadership skills but at the same time you care.  You are just a warm
> person and the bottom line is I like you and you have a great future.  So if I leave
> our team for this opportunity or another, I will always check in with you to see,
> just maybe if you have room for me ☺.

(Pl. Dep. Ex. 22, at 1.)

Ms. Beckford argues in her Opposition that although at the time she "*thought* [Ms.]

Gregory was handling things well" and Ms. Gregory "made her *feel* like she was supportive, in

truth, that was deceptive as she was not supportive once one looks under the surface of the

statements made."  (ECF No. 51, at 6 (emphasis in original).)  Even read favorably and drawing

all reasonable inferences in Ms. Beckford's favor, any suggested deception is not supported by

the record and does not create a material dispute.  *See Kanu v. Garland*, 672 F.Supp.3d 108,

116–17 (E.D. Va. 2023) ("[i]t is well established that a genuine issue of fact is not created where

the only issue of fact is to determine which of two conflicting versions of a party's [sworn]

testimony is correct.") (brackets in original) (citation and quotation marks omitted).[8]

---

[8] Furthermore, unlike in *Kanu*, Ms. Beckford does not identify two conflicting versions of
her own *sworn* testimony, but rather she cites her own sworn testimony where she praised Ms.
Gregory's leadership and supportiveness, and then *argues* in her Opposition that Ms. Gregory

7

Ms. Beckford points to the fact that Ms. Gregory did not file a Third Complaint and that she did not help move Ms. Beckford's desk when the friction between Ms. Beckford and Ms. Ayers escalated. But the failure to file a Third Complaint does not raise a reasonable inference of deception. Indeed, then-existing undisputed facts establish otherwise. First, by the time any third complaint had arrived, Ms. Beckford was in close contact with Mr. Jackson and was reporting to him directly. Ms. Gregory knew of this, and was participating in the investigation. (*See, e.g.*, Gregory Decl. ¶ 14.) Second, Ms. Gregory offered to help Ms. Beckford find other roles. (*See, e.g.*, Pl. Dep. Ex. 18, at 1.) Ms. Gregory gave a positive enough recommendation to Mr. Gentry that he ultimately rehired Ms. Beckford at Anthem. (ECF No. 50-4 ("Gentry Decl.") ¶ 4; Gregory Decl. ¶ 34.) Third, the fact that Ms. Gregory did not proactively move Ms. Beckford's desk to be further from Ms. Ayers does not rise anywhere near an adverse action, and does not indicate that Ms. Gregory was not supportive of Ms. Beckford. As noted above, after Ms. Beckford herself requested to move her desk, Ms. Gregory "immediately approved" this request. (Gregory Decl. ¶ 13; Gregory Decl. Ex. 5, at 1.)

### 4. Ms. Gregory Terminates Ms. Beckford's Employment Due to a Reduction in Force

In late 2020, Ms. Gregory "learned that Anthem was going to be conducting a reduction in force ["RIF"] in its Underwriting organization for cost-cutting reasons and because [it was] increasing automation." (Gregory Decl. ¶ 22.)[9] Ms. Gregory's manager informed her that she

---

"was not supportive once one looks under the surface of the statements made" by Ms. Gregory. (ECF No. 51, at 6.)

[9] In her Opposition, Ms. Beckford asserts that she did not lose her first role at Anthem due to a RIF, as no RIF actually existed. (ECF No. 51, at 7–10, 21 (contending that no evidence of a RIF was produced).) She argues that "Anthem's claim that there was a RIF is merely conveniently claimed to avoid a finding of pretext." (ECF No. 51, at 10.) She fails, however, to identify any evidence that raises a genuine dispute regarding the RIF's existence. But the

"would need to cut $550,000 from the budgeted costs in [her] group." (Gregory Decl. ¶ 22.) In response, Ms. Gregory decided to: (1) eliminate one of the two underwriter positions on the Virginia Key Accounts team; (2) not "fill the position of someone who was retiring"; (3) "eliminate[] a medical underwriter position[] from the MEWA[10] team"; and (4) "eliminate[] an Ohio underwriter position." (Gregory Decl. ¶ 22.) Ms. Gregory "made these decisions because [she] thought that the Virginia, MEWA, and Ohio groups could still accomplish their work with one fewer underwriter each." (Gregory Decl. ¶ 22.)

In December 2020, Ms. Gregory selected Ms. Beckford rather than Ms. Ayers to be terminated as part of the RIF. (Gregory Decl. ¶ 22.) Ms. Gregory was the sole employee who

---

undisputed record before the Court readily suggests otherwise. For example, as a part of the RIF Ms. Beckford received a "Reduction in Force Packet" that included multiple documents referencing the RIF. (*See* ECF No. 52-4 ("Reduction in Force Packet"), at 1, 3, 12–21, 28–30.) Additionally, Anthem's Human Resources department maintained a spreadsheet documenting information about employees selected to be let go as part of the RIF. (*See* ECF No. 52-3 ("Reduction in Force Spreadsheet"), at 2–3.)

Furthermore, Ms. Gregory identified multiple reasons for selecting Ms. Beckford over Ms. Ayers for the RIF, including the reason that at the time of the RIF, Ms. Ayers had worked as an underwriter at Anthem for over fourteen years, while Ms. Beckford had worked there for fewer than two—a fact that remains undisputed. (Gregory Decl. ¶ 23.) Although Ms. Gregory did not believe that Ms. Beckford "was a poor performer", her "performance simply was not as good as Ms. Ayers'[s] performance over the 2019-2020 period." (Gregory Decl. ¶ 24.) Ms. Ayers also had more experience than Ms. Beckford with the administrative, non-underwriting tasks involved in account renewals, which made her a more suitable backup for the employee assigned to such tasks for the Virginia Accounts team. (Gregory Decl. ¶¶ 9, 25.) Ms. Ayers had more experience than Ms. Beckford with the administrative, non-underwriting tasks involved in account renewals, which made her a more suitable backup for the employee assigned to such tasks for the Virginia Accounts team. (Gregory Decl. ¶¶ 9, 25.) Finally, Ms. Gregory concluded that "Ms. Ayers would be better able to handle the increased volume of work that the one remaining underwriter would be expected to handle after the elimination of the other underwriter position." (Gregory Decl. ¶ 26.)

[10] Ms. Gregory does not define "MEWA" in her declaration. (*See generally*, Gregory Decl.) In its summary judgment briefing, Anthem defines "MEWA" as the Multiple Employer Welfare Arrangement team. (*See* ECF No. 50, at 11 n.4.) The precise definition of "MEWA" is immaterial to the Court's analysis today, and the Court need not confirm this definition.

made this decision. (Gregory Decl. ¶ 27.) Ms. Ayers "did not provide any input to [Ms. Gregory] regarding that decision", nor did Ms. Ayers have "any advance notice that a RIF was going to occur." (Gregory Decl. ¶ 27.) Ms. Gregory's manager, VP of Commercial Underwriting Andrea Schell, approved Ms. Gregory's decision to terminate Ms. Beckford's employment. (Gregory Decl. ¶ 27.) Anthem's Legal Department and Ms. Gregory's Human Resources Business Partner also reviewed this decision. (Gregory Decl. ¶ 27.)

Ms. Gregory chose to terminate Ms. Beckford's (rather than Ms. Ayers') employment for four reasons. (Gregory Decl. ¶¶ 22–26.) First, Ms. Ayers had worked as an underwriter at Anthem for over fourteen years, while Ms. Beckford had worked there for fewer than two. (Gregory Decl. ¶ 23.) Given this, "Ms. Ayers had a much greater breadth and depth of knowledge of the requirements of the job and handled a wider range of issues." (Gregory Decl. ¶ 23.) Second, although Ms. Gregory did not believe that Ms. Beckford "was a poor performer", her "performance simply was not as good as Ms. Ayers'[s] performance over the 2019-2020 period." (Gregory Decl. ¶ 24.) Third, Ms. Ayers had more experience than Ms. Beckford with the administrative, non-underwriting tasks involved in account renewals, which made her a more suitable backup for the employee assigned to such tasks for the Virginia Accounts team. (Gregory Decl. ¶¶ 9, 25.)

Fourth and finally, Ms. Gregory concluded that "Ms. Ayers would be better able to handle the increased volume of work that the one remaining underwriter would be expected to handle after the elimination of the other underwriter position." (Gregory Decl. ¶ 26.) In reaching this conclusion, Ms. Gregory noted that Ms. Ayers had successfully served as the only underwriter for all of Virginia for approximately four months prior to Ms. Beckford's hiring. (Gregory Decl. ¶¶ 8, 26.) In contrast, Ms. Beckford "at times struggl[ed] to keep up with the

volume of underwriting work for her half of the [Commonwealth]". (Gregory Decl. ¶ 26.)[11] Ms.

Gregory received complaints about Ms. Beckford's slower turnaround times and spoke to her

_____

[11] Danyelle Bonner (an Anthem Sales representative) states in her declaration that Ms. Beckford was "an excellent underwriter[,] and it seemed to [her] that she was doing quite well, especially given she was handling a much larger area than the other underwriter, Pam Ayers." (ECF No. 51-1, at 262 ¶ 6 ("Bonner Decl.").) Ms. Bonner further states that Ms. Beckford "was handling a lot of sales reps" and Ms. Beckford's assigned regions "were a lot bigger than what Pam Ayers was handling." (Bonner Decl. ¶ 8.) Separately, Ms. Williams asserts that "[Ms.] Beckford had the bulk of the workload because she had the most territories." (ECF No. 51-1, at 158, Williams Decl. ¶ 12.) However, "an employee may not introduce testimony of his [or her] co-workers to establish [the] satisfaction of [the] supervisor's legitimate performance expectations." *King v. Rumsfeld*, 328 F.3d 145, 159 (4th Cir. 2003) (Gregory, J. concurring in part and dissenting in part). Furthermore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

Regardless, to the extent there even could be a genuine dispute regarding whether Ms. Beckford had a greater workload than Ms. Ayers, (*see, e.g.*, Pl. Decl. ¶ 32), such a dispute would be immaterial. The Court's conclusion below regarding Ms. Beckford's failure to state a prima facie case of race discrimination or retaliation does not rely in any way on whether Ms. Beckford had a greater workload than Ms. Ayers. *See* Sections III.A–B. The Court's analysis regarding Ms. Beckford's FMLA interference claim also does not rely on this question. *See* Section III.C.

At bottom, Ms. Bonner and Ms. Williams' statements do not rise to a genuine or material dispute. Despite statements that they believed that Ms. Ayers treated others differently because of their race, this bears no relevance to Ms. Beckford's termination where the undisputed record establishes that Ms. Ayers played no role in structuring the RIF. Furthermore, Ms. Bonner's conclusory statement that "Bridget accused [Ms.] Ayers of using the 'N' word and [Ms.] Gregory / Anthem seemed to ignore it", (Bonner Decl. ¶ 11), fails to create a genuine dispute of material fact. As noted above, on January 31, 2020, Ms. Beckford reported to Ms. Gregory that Ms. Ayers "used inappropriate language in her presence", and "indicated that one of the comments was racial in nature and was extremely serious." (Gregory Decl. ¶ 11.) In response, on February 2, 2020, Ms. Gregory "filed a formal concern on behalf of Ms. Beckford with Anthem's Ethics & Compliance department and Anthem's Associate Relations department." (Gregory Decl. ¶ 12; Gregory Decl. Ex. 3; ECF No. 50-2 ("Pl. Dep." or "Pl. Dep. First Excerpt"), at 74:19–75:22.) Ms. Gregory later filed a second formal complaint with Anthem's Associate Relations department out of concern that Ms. Ayers was retaliating against Ms. Beckford in response to the First Investigation. (Gregory Decl. ¶ 16; Gregory Decl. Ex. 7, at 1; Pl. Dep. at 142:9–144:9.)

11

several times to address her being "behind in her work." (Gregory Decl. ¶ 26; Gregory Decl. Ex. 17, at 2; Gregory Decl. Ex. 18, at 1.)[12]

When choosing to terminate Ms. Beckford's employment, Ms. Gregory weighed the above four reasons equally. (Gregory Decl. ¶ 28.) Neither Ms. Beckford's race nor her complaints about Ms. Ayers factored into Ms. Gregory's decision. (Gregory Decl. ¶¶ 29–30; *see also* ECF No. 51-1, at 14 ¶¶ 39–41 ("Pl. Decl.") (arguing that Ms. Gregory *should* have considered Ms. Beckford's complaints against Ms. Ayers when deciding whom to terminate, and

---

[12] Ms. Beckford argues in her Opposition that she "handled 90% of the work through Peak season (Halloween – middle of January)." (ECF No. 51, at 11 (citing ECF No. 51-1, at 209–211 ("Ex. B11")).) Even viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to Ms. Beckford, as the Court is required to do, *Anderson*, 477 U.S. at 255, the Court is unable to draw this inference from Ex. B11. Ex. B11 reflects eighteen accounts that were "pending review", and reflects that Ms. Beckford was assigned to seventeen of these pending accounts, while Ms. Ayers was responsible for one pending account. (Ex. B11, at 210–11.) In her declaration, Ms. Gregory explains that Ex. B11 constitutes a list of quotes "that were outstanding **on that day** and needed review." (Second Gregory Decl. ¶ 10 (emphasis in original).) Ms. Gregory attached the spreadsheet reflected in Ex. B11 to a November 2020 email to Ms. Ayers and Ms. Beckford to discuss the outstanding accounts and to remind them that "[s]taying on top of quotes is just as critical as staying on top of [other tasks]." (Second Gregory Decl. ¶ 10; Second Gregory Decl. Ex. C, at 1–3; Second Gregory Decl. Ex. B, at 2–3.)

Ms. Beckford also states in her declaration attached to her Opposition that in preparation for a January 28, 2020 meeting with Ms. Gregory, she "prepared a document to show" that she was completing "the vast majority of work." (Pl. Decl. ¶ 34 (citing ECF No. 51-1, at 460–464 ("Ex. B30")).) Ms. Beckford admits that she did not produce Ex. B30 during discovery. (Pl. Decl. ¶ 32.) Even if the Court were to consider this untimely document, however, for the same reasons discussed above with respect to Ex. B11, Ex. B30 does not support an inference that Ms. Beckford had a greater workload than Ms. Ayers. Any snapshot in time cannot create a pattern.

And, regardless, to the extent a genuine dispute could exist regarding whether Ms. Beckford had a greater workload than Ms. Ayers, (*see, e.g.*, Pl. Decl. ¶ 32), such a dispute would be immaterial. The Court's conclusion below regarding Ms. Beckford's failure to state a prima facie case of race discrimination or retaliation does not rely in any way on whether Ms. Beckford had a greater workload than Ms. Ayers. *See* Sections III.A–B. The Court's analysis regarding Ms. Beckford's FMLA interference claim also does not rely in any on way on this question. *See* Section III.C.

12

noting that "instead[,] [Ms. Gregory] was only focused on [Ms. Ayers'] perceived greater performance.").)  Moreover, at the time of her decision, Ms. Gregory "was not aware that [Ms. Beckford] had filed a charge of discrimination with the [Equal Employment Opportunity Commission.]"[13]  (Gregory Decl. ¶ 29.)

"On February 4, 2021", Ms. Gregory "met with Ms. Beckford to inform her that she was being let go as part of the reduction in force, effective March 12, 2021." (Gregory Decl. ¶ 32.) On March 12, 2021, Ms. Beckford's employment with Anthem was terminated.  (Gregory Decl. ¶ 32.)  Although "[a]s part of the reduction in force" Ms. Gregory had the option of listing Ms. Beckford as ineligible for rehire, Ms. Gregory listed her as "eligible for rehire." (Gregory Decl. ¶ 34.)

---

[13] Inconsistently, in a sworn statement submitted to the Equal Employment Opportunity Commission ("EEOC"), Ms. Beckford wrote that she "believe[s] the decision to let [her] go was entirely based on [her] complaints against Ms. Ayers regarding race discrimination." (Pl. Dep. Ex. 65 ¶ 17.)  At her deposition, Ms. Beckford again reaffirmed that she believes the decision to terminate her employment was predicated entirely on her complaints about Ms. Ayers. (Pl. Dep., at 164:18–165:18.)  When asked directly whether she believes Ms. Gregory also made the decision to terminate Ms. Beckford due to her race, Ms. Beckford stated:  "I don't know." (Pl. Dep., at 354:1–19.)

Even viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to Ms. Beckford, as the Court is required to do, *Anderson*, 477 U.S. at 255, the Court is unable to draw the inference that Ms. Beckford's complaints about Ms. Ayers factored into Ms. Gregory's decision. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("summary judgment affidavits cannot be conclusory or based upon hearsay.") (internal citations omitted).  "Clearly [Ms. Beckford] believes that she was retaliated against" as a result of her complaints, "but that alone is insufficient." *Brackman v. Fauquier Cnty.*, 72 F. App'x 887, 894 (4th Cir. 2003); *see also Kanu*, 672 F.Supp.3d at 116–17 ("[i]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of two conflicting versions of a party's testimony is correct.") (brackets in original) (citation and quotation marks omitted).  Fatal to her retaliation claims, as explicated later, Ms. Beckford fails to adduce evidence that creates a causal link between her complaints regarding Ms. Ayers and her March 12, 2021 lay off.

### 5.    <u>Anthem Re-Hires Ms. Beckford to the Ohio Large Group Team</u>

Soon after learning of her pending termination and before her last day on the Virginia

Accounts team, Ms. Beckford began applying to other roles at Anthem.  (Pl. Dep., at 174:8–22;

Pl. Dep. Ex. 25, at 2.)[14]  In March 2021, Ms. Beckford applied to a "Group Underwriter II or

Senior" role on the Ohio Large Group team ("Job No. 2").  (Pl. Dep., at 176:12–177:1; Pl. Dep.

Ex. 25, at 2; Gregory Decl. ¶ 34.)  The manager of the team, Craig Gentry, and the Regional

Vice President, Jason Harpold, spoke with Ms. Gregory about Ms. Beckford's application.

(Gregory Decl. ¶ 34.)

---

[14] In her Opposition brief, Ms. Beckford claims that in May 2021 she applied to her former Underwriter II position, and that Ms. Gregory posted the position. (ECF No. 51, at 7.) This contention is directly contradicted by undisputed evidence.  In May 2021, Ms. Beckford applied to a Group Underwriter II position in the Anthem Balanced Funding group ("ABF") reporting to Heather Burgess; this position is distinct from Ms. Beckford's prior position on the Virginia Key Accounts Team under Ms. Gregory.  (Pl. Dep. Ex. 25, at 2; Second Gregory Decl. ¶¶ 21–22.)

Similarly, Ms. Bonner, a fellow employee, asserts that after Ms. Beckford was let go, Anthem brought Beverly Owens, a white woman who had previously retired, back "in to help [Ms.] Ayers because she was so busy." (Bonner Decl. ¶ 13.)  As a threshold matter, Ms. Bonner's declaration fails to provide facts indicating that Ms. Bonner makes this assertion based on personal knowledge. (*See generally,* Bonner Decl.)  Moreover, both Ms. Owens and Ms. Gregory consistently state that Ms. Owens retired from Anthem in 2018 and then briefly returned to provide part-time underwriting support as a temporary contractor during peak season from November 2019 until January 19, 2020—over a year before Ms. Beckford was let go in March 2021. (ECF No. 52-7 ¶¶ 2–8; Second Gregory Decl. ¶¶ 5–8; Gregory Decl. ¶ 32.)

Ms. Bonner's contrary assertion relates to the question of whether the reasons provided for Ms. Beckford's termination from employment are pretextual.  But because Ms. Beckford fails to establish a prima facie case of discrimination, the Court need not, and should not, turn to the question of whether Ms. Gregory's reasons for terminating Ms. Beckford were pretextual. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000).  Moreover, even if the Court were to turn to the evaluation of pretext, it would not credit this portion of Ms. Bonner's conclusory testimony. *See Christian v. Family and Child Empowerment Servs., Inc.*, 2019 WL 8886225 (RJK), at *1 (E.D. Va. Jul. 30, 2019) ("A court may strike portions of a declaration in support of summary judgment when, for example, . . . the statements in those portions are conclusory or lack sufficient factual support for the court to conclude that the statements were based on the affiant's personal knowledge.")

Ms. Gregory reported to Jason Harpold, "Regional VP Ohio Underwriting," and to Mr. Gentry "that Ms. Beckford had performed well in her role in [her] group." (Gregory Decl. ¶ 34.) On June 16, 2021, Anthem offered Ms. Beckford the position "Underwriting Analyst II" under manager Craig Gentry. (Pl. Dep. Ex. 32, at 1.) The role came with an approximate 13% hourly pay *increase* over what she had been making on the Virginia Accounts team. (Pl. Dep., at 184:3–185:8; Pl. Dep. Ex. 32, at 1; Gentry Decl. ¶¶ 5–6.)

On July 12, 2021, Ms. Beckford began working as an Underwriting Analyst II under Craig Gentry in the Ohio Large Group Team. (Gentry Decl. ¶ 3; Pl. Dep., at 58:12–59:4, 188:11–17; ECF No. 50-5 ("Hill Decl.") ¶ 5.)

### 6.  Ms. Beckford Requests a Leave of Absence and Resigns Soon After

Just two months later, on September 22 and 23, 2021, the undisputed record establishes that Ms. Beckford took paid time off from work to care for her husband after he had appendix-related surgery. (Pl. Dep., at 222:5–225:11; Pl. Dep. Ex. 41, at 1; Pl. Dep. Ex. 42, at 1; Gentry Decl.    ¶ 9.) Ms. Beckford then requested leave from September 24, 2021 through October 8, 2021 under the Family and Medical Leave Act ("FMLA"). (Pl. Dep. Ex. 44, at 1; Pl. Dep. 224:9–22.)

By way of background, Anthem initially made misstatements regarding Ms. Beckford's FMLA leave eligibility and ultimately denied her FMLA leave request without her receiving any FMLA leave. (*See, e.g.*, Pl. Dep. Ex. 44, at 1; Pl. Dep., at 262:13–17.) Later, as an Americans with Disabilities Act ("ADA") accommodation, Anthem approved Ms. Beckford "for a leave of absence . . . from October 6, 2021 through January 17, 2022." (Gentry Decl. ¶ 12.) As a result of these events, Ms. Beckford took approximately 4.5 unapproved business days off from the middle of September 29, 2021 through October 5, 2021. She was not disciplined for these

15

unapproved absences, nor was she financially harmed as a result of Anthem's incorrect statements regarding her FMLA leave eligibility or the ultimate denial of her FMLA leave. (Pl. Dep., at 283:2–284:4, 349:16–350:9.)

Specifically, on September 24, 2021, Anthem's Leave of Absence department denied Ms. Beckford's FMLA request, explaining that she had not worked the requisite number of hours to be eligible for FMLA leave. (Pl. Dep. Ex. 44, at 1.) Ms. Beckford then contacted Anthem's Leave of Absence department and an unidentified employee in that department told her that by Wednesday, September 29, 2021 she would be eligible for FMLA leave. (Pl. Dep. 237:1–238:6.) On September 29, 2021, the Leave of Absence department emailed Ms. Beckford notifying her that she was eligible for FMLA leave as of that date. (Pl. Dep. Ex. 50, at 1.) The email went on to explain that for the "department to determine whether an absence qualified as FMLA leave, [Ms. Beckford's] supporting documentation must be received by 10/20/2021." (Pl. Dep. Ex. 50, at 1.)

On approximately October 6, 2021, while still on leave related to her husband's appendix surgery, Ms. Beckford submitted a request for continuous leave under the FMLA beginning on October 6, 2021 due to her own unspecified medical condition. (Pl. Dep. Ex. 51, at 1; Pl. Dep., at 244:13–244:20.) In a letter dated October 6, 2021, Anthem's Leave of Absence department tentatively approved the request, and noted that Ms. Beckford must send supporting documentation by October 27, 2021 so the department could determine whether this absence would qualify as FMLA leave. (Pl. Dep. Ex. 51, at 1.)

A week later, on October 13, 2021, the Leave of Absence department sent follow-up communications to Ms. Beckford informing her that she was ineligible for FMLA leave. (Pl. Dep. Ex. 53, at 1; Pl. Dep. Ex. 54, at 1.) That same day, the department sent Ms. Beckford a

16

letter and email explaining that Anthem would consider her October 6, 2021 leave request for her own medical condition as a request for a disability accommodation. (Pl. Dep. Ex. 55, at 1.)  The letter explained that the department needed "additional information . . . to determine [Ms. Beckford's] eligibility for reasonable accommodations", and asked her to send a statement from her healthcare provider by November 3, 2021. (Pl. Dep. Ex. 55, at 1.)

On October 18 and 19, 2021, employees from the Leave of Absence department explained to Ms. Beckford that Anthem had denied her FMLA leave requests because she had not worked the requisite number of hours within the last twelve months. (Pl. Dep., at 262:13–17; 264:13–265:5; Pl. Dep. Ex. 57, at 1; ECF No. 50-6 ("Mock Decl.") ¶¶ 4–5; Mock Decl. Ex. 1, at 1.)  In the October 19, 2021 communication, a Leave of Absence department employee explained that due to a glitch in Anthem's system, denial letters were reflecting inaccurate amounts of hours worked, and that as of that date, Ms. Beckford had only worked 1,069.62 hours within the past 12 months, which is below the 1,250 hours necessary to qualify for FMLA leave. (Pl. Dep. Ex. 57, at 1; *see, e.g.*, Pl. Dep. Ex. 44, at 1.)[15]

_____

[15] As noted above, Ms. Beckford's last working day at Anthem was on September 29, 2021, when she worked for an unspecified number of hours. (Pl. Dep. 233:11–22; 237:6–238:9.) The uncontradicted record establishes that from September 29, 2020 through March 12, 2021, "Ms. Beckford worked no more than 789 hours." (Gregory Decl. ¶¶ 36–37.) Ms. Beckford's employment with Job No. 1 ended on March 12, 2021. (Gregory Decl. ¶ 3.) Ms. Beckford's employment with Job No. 2 began on July 12, 2021. (Hill Decl. ¶ 5.) From July 12, 2021 through September 28, 2021, "Ms. Beckford worked no more than 417 hours." (Hill Decl. ¶ 10.) In other words, from September 29, 2020 through September 28, 2021, Ms. Beckford worked *no more* than 1,206 hours. This number is slightly higher than the 1,069.62 hours reflected in Anthem's October 19, 2021 communications to Ms. Beckford reflected in Pl. Dep. Ex. 57, at 1. To the extent these numbers could be considered inconsistent, the discrepancy is immaterial. Both numbers are below the requisite 1,250 hours necessary for FMLA leave eligibility.

In her Opposition, Ms. Beckford attempts to dispute the fact that she did not work the requisite 1,250 hours in the twelve months preceding September 29, 2020. (ECF No. 51, at 14 (citing ECF No. 51-1, at 9–10 ¶¶ 24, 28 ("Pl. Decl.")).) Ms. Beckford fails, however, to present any admissible evidence rebutting Anthem's evidence that she did not work the requisite 1,250

Ms. Beckford was not financially harmed by Anthem's misstatements regarding her leave eligibility, nor by Anthem's denial of her FMLA leave requests. (Pl. Dep., at 349:16–350:9 (when asked if she incurred financial harm as a result, Ms. Beckford stated, "[n]ot financial, no", and then confirmed that she did, however, experience stress).)

As an Americans with Disabilities Act ("ADA") accommodation, Anthem ultimately approved Ms. Beckford "for a leave of absence . . . from October 6, 2021 through January 17, 2022." (Gentry Decl. ¶ 12.) Because Ms. Beckford's last working day at Anthem was on September 29, 2021, when she worked for an unspecified number of hours (Pl. Dep. 233:11–22; 237:6–238:9), Ms. Beckford took approximately 4.5 unapproved business days off from the middle of September 29, 2021 through October 5, 2021. Anthem did not discipline Ms. Beckford for these unapproved absences, nor did her manager Mr. Gentry pressure her to come back or threaten to discipline her due to her taking leave. (Pl. Dep., at 283:2–284:4.)[16]

---

hours. It remains undisputed that Anthem informed Ms. Beckford that its notices stating that Ms. Beckford worked more than the requisite 1,250 hours were caused by computer errors. (*See* Pl. Dep., at 264:6–265:5; Pl. Dep. Ex. 57, at 1; Mock Decl. ¶¶ 4, 6.)

At her deposition, Ms. Beckford conceded that despite stating that "[Anthem's] check stub has the hours on there", the pay stub she produced fails to reflect that she worked at least 1,250 hours. (ECF No. 52-5 ("Pl. Dep. Second Excerpt"), at 270:6–273:11.) During her deposition, Ms. Beckford also stated that she used both a calendar (which she conceded she no longer possesses) and a Word document to track her hours. (Pl. Dep. Second Excerpt, at 189:8–194:16.) After her deposition, Ms. Beckford's counsel wrote in an email to Anthem's counsel that he was unable to locate "[a]ny notes, records, calendars, or calculations of the hours Ms. Beckford worked during her employment with Anthem (including but not limited to the 'Word document' she described in her deposition)." (ECF No. 52-6, at 1.) As such, Ms. Beckford fails to create a genuine dispute of material fact as to this issue. *See Kanu*, 672 F.Supp.3d at 116–17 ("[i]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of two conflicting versions of a party's testimony is correct.") (brackets in original) (citation and quotation marks omitted).

[16] Like FMLA leave, leave under the ADA is unpaid. (Mock Decl. ¶ 6.)

On December 22, 2021, while still on ADA leave, Ms. Beckford resigned from Anthem. (Pl. Dep. 279:9–280:18, 304:2–18; Hill Decl. ¶ 11.)

**B.**   **Procedural Background**

On November 9, 2022, Ms. Beckford filed an initial Complaint in the Circuit Court for the City of Richmond. (ECF No. 1-1, at 3.) On May 1, 2023, she filed an Amended Complaint and, three days later, she filed a Second Amended Complaint. (ECF No. 1-1, at 37, 62.)

In her Second Amended Complaint Ms. Beckford asserts nine counts against Anthem:

| | |
|---|---|
| **Count I:** | Race Discrimination in Violation of Title VII of the Civil Rights Act ("Title VII"); |
| **Count II:** | Retaliation in Violation of Title VII; |
| **Count III:** | Race Discrimination in Violation of 42 U.S.C. § 1981; |
| **Count IV:** | Retaliation in Violation of 42 U.S.C. § 1981; |
| **Count V:** | Race Discrimination in Violation of the Virginia Human Rights Act ("VHRA"); |
| **Count VI:** | Retaliation in Violation of the VHRA; |
| **Count VII:** | Violation of the Virginia Fraud and Abuse Whistleblower Protection Act ("VWPA")" (previously dismissed); |
| **Count VIII:** | Interference in Violation of the Family and Medical Leave Act; and, |
| **Count IX:** | Failure to Accommodate in Violation of the Americans with Disabilities Act ("ADA") (previously dismissed). |

(ECF No. 1-1, at 73–84.)

On December 6, 2023, Anthem removed this matter to this Court, (ECF No. 1), and filed its Answer on December 13, 2023, (ECF No. 5). On January 16, 2024, Anthem filed a Motion for Partial Judgment on the Pleadings. (ECF No. 14.) Ms. Beckford responded, (ECF No. 20), and Anthem replied, (ECF No. 21). On August 7, 2024, Anthem filed a Motion for Summary

19

Judgment, requesting that the Court dismiss the Second Amended Complaint in its entirety. (ECF No. 41; ECF No. 42, at 6–8.)

On August 28, 2024, the Court granted the Motion for Partial Judgment on the Pleadings, dismissing Counts VII (Violation of the VWPA) and IX (Failure to Accommodate in Violation of the ADA).[17] (ECF Nos. 47, 48.) As a result of this development and in the interest of judicial economy, the Court denied the Motion for Summary Judgment as moot. (ECF No. 48, at 1.) The Court further ordered Anthem to file an Amended Motion for Summary Judgment within fourteen days. (ECF No. 48, at 1–2.)

On August 30, 2024, Anthem filed an Amended Motion for Summary Judgment, requesting that the Court dismiss the Second Amended Complaint in its entirety. (ECF No. 49; ECF No. 50, at 7–8.) Ms. Beckford responded, (ECF No. 51), and Anthem replied, (ECF No. 52). For the reasons articulated below, the Court will grant the Amended Motion for Summary Judgment.

## II. Standard of Review: Summary Judgment

Summary judgment under Federal Rule of Civil Procedure 56[18] is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party,

---

[17] The Court further noted that "to the extent Ms. Beckford attempts to raise a claim of constructive discharge, the claim fails because, *inter alia*, Ms. Beckford has failed to raise a stand-alone claim of constructive discharge in her Second Amended Complaint. (ECF No. 47, at 10; *see also* ECF No. 48, at 1.)

[18] Rule 56(a) provides:

(a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

20

determines that there exists no genuine issue of material fact and that the moving party is entitled

to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Once a party has properly filed

evidence supporting the motion for summary judgment, the nonmoving party may not rest upon

mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine

issues for trial. *Celotex Corp.*, 477 U.S. at 322–24. These facts must be presented in the form of

stipulations, exhibits, and sworn affidavits or declarations. Fed. R. Civ. P. 56(c).[19] Moreover,

the facts offered by a sworn declaration must also be in the form of admissible evidence,

meaning the statements in the sworn declaration "must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Therefore, "summary judgment

---------

> of law. The court should state on the record the reasons for granting or denying
> the motion.

Fed. R. Civ. P. 56(a).

[19] Rule 56(c) states, in pertinent part:

> (c) PROCEDURES.
>
> > (1) Supporting Factual Positions. A party asserting that a fact cannot be or
> > is genuinely disputed must support the assertion by:
> >
> > > (A) citing to particular parts of materials in the record, including
> > > depositions, documents, . . . affidavits or declarations, stipulations
> > > (including those made for purposes of the motion only), . . . or
> > > other materials; or
> > >
> > > (B) showing that the materials cited do not establish the absence or
> > > presence of a genuine dispute, or that an adverse party cannot
> > > produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of [its] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). However, "'there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed.'" *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). Thus, "the nonmoving party must rely on more than conclusory allegations, 'mere speculation,' the 'building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of 'some metaphysical doubt.'" *Lamar v. Ebert*, No. 2:12cv706 (HCM), 2018 WL 11463829, at *3 (E.D. Va. Mar. 20, 2018) (quoting *Anderson*, 477 U.S. at 252; *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 688, 671 (E.D. Va. 2004)).

At this stage, the Court is tasked with assessing whether a plaintiff "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Further, "[w]hen opposing

parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323–24).

### III. Analysis

Anthem moves for summary judgment on the remaining claims against it: race discrimination, (Counts I, III, and V), retaliation, (Counts II, IV, and VI), and interference in violation of the FMLA, (Count VIII). (ECF No. 50, at 7–8; ECF No. 1-1, at 73–81, 83.) For the reasons articulated below, the Court will grant the Amended Motion for Summary Judgment.

Even viewing the record as a whole and in the light most favorable to Ms. Beckford, her claims fail. Ms. Beckford has identified no admissible evidence that would allow a reasonable inference that Ms. Gregory's decision to terminate her employment was (1) attributable to discriminatory animus or (2) causally connected to her complaints regarding Ms. Ayers. As a result, her discrimination and retaliation claims cannot stand. Furthermore, Ms. Beckford has identified no admissible evidence that would allow a reasonable inference that she was eligible for FMLA leave at the time she requested it in September 2021. And, even if she had, she also does not identify evidence showing that she was prejudiced by Anthem's denial of her FMLA leave. As a result, her FMLA interference claim also fails.

A. **Ms. Beckford Does Not Present a Genuine Issue of Material Fact Sufficient to Sustain a Claim of Race Discrimination against Anthem (Counts I, III, and V)**

Ms. Beckford brings Counts I, III, and V under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 1981, and the Virginia Human Rights Act ("VHRA") against Anthem, claiming that Anthem terminated her from Job No. 1 on March 12, 2021 due to her race. (ECF No. 1-1, at 73, 76, 79.) The Court concludes that Ms. Beckford has failed to present evidence that her race played any factor in Anthem's decision to terminate her employment on March 12, 2021. Because, even viewing the record as a whole and in the light most favorable to Ms. Beckford, she has not adduced evidence from which a reasonable jury could find that her race played any factor in her termination, Ms. Beckford is unable to show a prima facie case of discrimination. As a result, Counts I, III, and V fail as a matter of law.

1. **Legal Standard:  Race Discrimination Under Title VII, the VHRA, and § 1981**

To prevail on a race discrimination claim under Title VII or the VHRA, a plaintiff must show that his or her race was a "motivating factor" behind the decision causing his or her injury. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020) (discussing Title VII's "motivating factor" test); Va. Code § 2.2-3905(B)(6)[20] (it is "an unlawful

---

[20] Va. Code § 2.2-3905(B) provides, in pertinent part:

B. It is an unlawful discriminatory practice for:

\*       \*       \*

6. Except as otherwise provided in this chapter, an employer to use race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions, age, military status, disability, or ethnic or national origin as a motivating factor for any employment practice, even though other factors also motivate the practice.

discriminatory practice" to consider race "as a motivating factor for any employment practice".)

To prevail on a § 1981 claim, a plaintiff bears the burden of showing that his or her race was the

but-for cause of his or her injury. *Comcast Corp.*, 589 U.S. at 341.

When evaluating claims for race discrimination, even in the context of § 1981 cases

which require a heightened standard of proof, the United States Court of Appeals for the Fourth

Circuit applies the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973) (the "*McDonnell Douglas* framework"). *See Gary v. Facebook, Inc.*, 822 F. App'x 175,

180 (4th Cir. 2020) (acknowledging that the framework can be applied to a § 1981 claim "as 'a

tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect

proof of discrimination.'" (quoting *Comcast Corp.*, 589 U.S. at 340).)

In the context of a RIF, the Fourth Circuit applies a modified *McDonnell Douglas*

framework. *See Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 720–21 (4th Cir. 2002).[21]

Under that framework in the context of a RIF, to establish a prima facie case of discrimination a

plaintiff must show:  (1) he or she is a member of a protected class; (2) he or she suffered an

---

Va. Code § 2.2-3905(B)(6).

[21] As the Fourth Circuit has explained in a demotion claim:

> The traditional *McDonnell Douglas* framework is slightly changed in a RIF case.
> Normally, the plaintiff in a discrimination-in-hiring context has to prove that (1) she [or
> he] belongs to a protected class, (2) she [or he] applied and was qualified for a job for
> which the employer was seeking applicants, (3) despite her [or his] qualifications, she [or
> he] was rejected, and (4) after her [or his] rejection, the position remained open and the
> employer continued to seek applicants from persons with her [or his] qualifications.
> *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668
> (1973). There are now variations of this basic framework depending on the statute involved
> and the nature of the claim of discrimination. *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th
> Cir. 2000).

*Dugan*, 293 F.3d at 720 n.1.

adverse employment action (such as a discharge or demotion); (3) he or she was performing his or her job at a level that satisfied the employer's expectations; and (4) that his or her employer did not treat the protected status neutrally, or other circumstances exist that support an inference of discrimination. *See Dugan*, 293 F.3d at 720–21 (evaluating discrimination claim in RIF context where plaintiff was demoted rather than discharged); *see also Romano v. Verisign, Inc.,* No. 1:22CV00549 (AJT), 2023 WL 1797890, at \*5 (E.D. Va. Feb. 7, 2023), *appeal dismissed,* No. 23-1224, 2023 WL 5573908 (4th Cir. June 1, 2023) (evaluating job elimination) ("In the context of a reduction in force, discrimination is proven when a plaintiff can show a protected status was not treated neutrally or by other circumstances[.]" (citing *Dugan*, 293 F.3d at 720–21).)

If a plaintiff establishes a prima facie case of discrimination, a defendant may then rebut this prima facie case by identifying legitimate, nondiscriminatory reasons for the plaintiff's adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Only after this showing may a plaintiff present an argument that the reasons defendant provided were in fact pretextual. *Id.* at 143. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. "Although intermediate evidentiary burdens shift back and forth under this framework", the burden of persuasion "'remains at all times with the plaintiff.'" *Id.* (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). Proof of retaliation at the pretext stage requires the showing of a but-for cause of a challenged adverse action. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015).

26

When the same person both hires and fires a plaintiff, "'a powerful inference [arises] that the [action] was not motivated by discriminatory animus." *Smyth-Riding v. Sciences & Eng'g Servs., LLC*, 699 F.App'x 146, 157–58 (4th Cir. 2017) (brackets in original) (quoting *Evans*, 80 F.3d at 959); *see also Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes." (citation omitted)). "This is so because 'employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.'" *Smyth-Riding*, 699 F.App'x at 158 (quoting *Proud*, 945 F.2d at 798). A plaintiff's discrimination claim premised on a termination cannot survive summary judgment where the plaintiff fails "to raise a genuine issue of material fact on the issue of whether [the decisionmaker] harbored discriminatory animus toward [the plaintiff] that actually resulted in his [or her] demotion and termination." *Harris v. Home Sales Co.*, 499 F. App'x 285, 291 (4th Cir. 2012) (affirming grant of summary judgment in favor of defendant).

### 2. Ms. Beckford Has Created No Genuine Dispute as to Whether Her Termination Was Racially Motivated

Ms. Beckford has failed to identify any evidence indicating that Ms. Gregory considered her race when terminating her employment due to the RIF. Nor does she identify any circumstances that could give rise to an inference of racial discrimination. Rather, the record shows that Ms. Gregory both hired Ms. Beckford and later terminated her employment as part of the RIF. (Gregory Decl. ¶¶ 3–5, 22, 27; Second Gregory Decl. ¶¶ 3–4.) This supports a powerful inference that Ms. Beckford's race was not a motivating factor in her termination. *See Smyth-Riding*, 699 F.App'x at 157–58; *see also Proud*, 945 F.2d at 798.

Moreover, sworn statements from Ms. Beckford's deposition, declaration, and statement to the EEOC fail to give rise to a contrary inference that Ms. Gregory nonetheless terminated Ms. Beckford due even in part to her race. *See* ECF No. 51-1, at 14 ¶¶ 39, 41 ("Pl. Decl.") (arguing that Ms. Gregory *should* have considered Ms. Beckford's complaints against Ms. Ayers when deciding whom to terminate, and noting that "instead[,] [Ms. Gregory] was only focused on [Ms.] Ayers' perceived greater performance."); Pl. Dep. Ex. 65 ¶ 17 (Ms. Beckford's sworn statement to the EEOC stating inconsistently that she "believe[s] the decision to let [her] go was entirely based on [her] complaints against Ms. Ayers regarding race discrimination."); Pl. Dep., at 164:18–165:18, 354:1–19 (repeating belief that the decision to terminate her employment was in retaliation for her complaints regarding Ms. Ayers, and stating that she did not know whether her termination was also racially motivated). Furthermore, Ms. Gregory identified multiple reasons for selecting Ms. Beckford over Ms. Ayers for the RIF, including the reason that at the time of the RIF, Ms. Ayers had worked as an underwriter at Anthem for over fourteen years, while Ms. Beckford had worked there for fewer than two—a fact that remains undisputed. (Gregory Decl. ¶ 23.) Although Ms. Gregory did not believe that Ms. Beckford "was a poor performer", her "performance simply was not as good as Ms. Ayers'[s] performance over the 2019-2020 period." (Gregory Decl. ¶ 24.) Ms. Ayers also had more experience than Ms. Beckford with the administrative, non-underwriting tasks involved in account renewals, which made her a more suitable backup for the employee assigned to such tasks for the Virginia Accounts team. (Gregory Decl. ¶¶ 9, 25.) Ms. Ayers had more experience than Ms. Beckford with the administrative, non-underwriting tasks involved in account renewals, which made her a more suitable backup for the employee assigned to such tasks for the Virginia Accounts team. (Gregory Decl. ¶¶ 9, 25.) Finally, Ms. Gregory concluded that "Ms. Ayers would be better able

to handle the increased volume of work that the one remaining underwriter would be expected to handle after the elimination of the other underwriter position." (Gregory Decl. ¶ 26.) The nature of Ms. Ayers' previous experience and duties remains undisputed.

Having failed to adduce any evidence that would allow a reasonable factfinder to conclude that Ms. Gregory did not treat her race neutrally, or that any other circumstances exist that support an inference of discrimination in connection with Ms. Beckford's termination from employment, Ms. Beckford fails satisfy the fourth prong of the modified *McDonnell Douglas* framework. *See Dugan*, 293 F.3d at 720–21.[22]  As a result, she does not show a prima facie case of race discrimination. *See id.*  Having concluded that Ms. Beckford cannot make this prima facie showing, the Court must dismiss her race discrimination claims (Counts I, III, and V). *See Reeves*, 530 U.S. 142 ("First, the plaintiff must establish a prima facie case of discrimination."); *see also Romano*, 2023 WL 1797890 at *4 (dismissing racial discrimination claim on summary judgment where plaintiff failed to present evidence "of a discriminatory act or motive [that] would allow a reasonable factfinder to attribute the alleged discriminatory animus to the decision maker who selected [plaintiff's] position for termination.")[23]

---

[22] As articulated above, the fourth prong under the modified *McDonnell Douglas* framework requires a plaintiff to show "that [his or] her employer did not treat [the plaintiff's] protected status neutrally, or [that] there were other circumstances giving rise to an inference of discrimination." *Dugan*, 293 F.3d at 720–21.

[23] In her Opposition brief, Ms. Beckford does not substantively respond to Anthem's argument that Ms. Beckford fails to satisfy her initial burden under *McDonnell Douglas* of showing a prima facie case of race discrimination. (*See* ECF No. 51, at 11–12, 17–22.)  Instead, she prematurely jumps to her argument that Ms. Gregory's reasons for selecting her for termination were pretextual. (*See* ECF No. 51, at 11–12, 17–22.)  Because Ms. Beckford fails to establish a prima facie case of discrimination, the Court need not, and should not, turn to the question of whether Ms. Gregory's reasons for terminating Ms. Beckford were pretextual. *See Reeves*, 530 U.S. at 142–43.

**B.      Ms. Beckford Does Not Present a Genuine Issue of Material Fact Sufficient
to Sustain a Claim of Retaliation against Anthem (Counts II, IV, and VI)**

Ms. Beckford brings Counts II, IV, and VI under Title VII, § 1981, and the VHRA

against Anthem, claiming that Anthem terminated her from Job No. 1 on March 12, 2021 in

retaliation for her complaints of race discrimination against Ms. Ayers.  (ECF No. 1-1, at 74–75,

77–78, 80–81.)  The Court concludes that Ms. Beckford has failed to set forth evidence of causal

connection between her complaints about Ms. Ayers and her March 12, 2021 termination.  Even

viewing the record as a whole and in the light most favorable to Ms. Beckford, she has not

adduced evidence from which a reasonable jury could find this causal connection.  As a result,

Ms. Beckford is unable to show a prima facie case of retaliation, and Counts II, IV, and VI fail as

a matter of law.

**1.      Legal Standard:  Retaliation Under Title VII, § 1981, and the VHRA**

To prevail on a retaliation claim under Title VII, § 1981, or the VHRA in the absence of

direct evidence, a plaintiff "must first establish a prima facie case by showing:"  (1) that he or

she engaged in protected activity; (2) that he or she suffered an adverse employment action; and

(3) that there is a causal relationship between the protected activity and the adverse employment

action.  *See Foster*, 787 F.3d at 250 (discussing standard for Title VII retaliation claim); *Boyer-

Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (observing that a § 1981

retaliation claim has identical elements as a Title VII retaliation claim); *Dufort v. Liberty Univ.*,

No. 6:21cv00054, 2023 WL 137496, at *6 (W.D. Va. Jan. 9, 2023) (concluding that because the

VHRA "uses almost identical language" as "Title VII's anti-retaliation provision", a VHRA

retaliation claim is subject to the same legal analysis as a Title VII claim).

"'To satisfy the third element'" of a prima facie case of retaliation, "'the employer must

have taken the adverse employment action *because* the plaintiff engaged in a protected activity.'"

*Graves v. Indus. Power Generating Corp.*, No. 3:09cv717 (MHL), 2011 WL 63696, at *14 (E.D. Va. Jan. 5, 2011), *aff'd*, 438 F. App'x 174 (4th Cir. 2011) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998)) (emphasis in original). "This requires first that the plaintiff prove that the employer knew that the plaintiff had engaged in a protected activity." *Id.* "However, 'the fact that an employer's knowledge of the protected activity is necessary to finding a causal connection, does not mean that it is also sufficient for such a finding.'" *Id.* (internal quotation marks and citation omitted).

If a plaintiff establishes a prima facie case of retaliation, an employer then has the burden to rebut the prima facie case under the *McDonnell Douglas* framework by showing "that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250; *see also Graves*, 2011 WL 63696 at *15 ("Once a plaintiff has established a prima facie case of retaliation, the Court must then analyze the claim for retaliation under the *McDonnell Douglas* burden-shifting scheme." (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–03).) If an employer successfully makes this showing, then the plaintiff has the burden of showing "that the employer's purported non[-]retaliatory reasons" are in fact pretextual. *Foster*, 787 F.3d at 250. At bottom, a plaintiff presenting a retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *Foster*, 787 F.3d at 252.

> **2.    Ms. Beckford Has Created No Genuine Dispute as to Whether a Causal Connection Exists Between Her Complaints Regarding Ms. Ayers and Her Termination**

Again, to prevail on her retaliation claims, Ms. Beckford must show, *inter alia*, a causal relationship between her complaints of racial discrimination regarding Ms. Ayers and her March

12, 2021 termination. *See Foster*, 787 F.3d at 250. To make this showing, Ms. Beckford must

adduce evidence that Anthem terminated her employment because of her complaints regarding

Ms. Ayers. *See Graves*, 2011 WL 63696, at *14. Even viewing the record as a whole and the

reasonable inferences drawn therefrom, she has failed to do so.

　　The undisputed facts demonstrate that Ms. Gregory was supportive of Ms. Beckford

raising complaints about Ms. Ayers.[24] On February 3, 2020, after Ms. Beckford complained to

her regarding Ms. Ayers's discriminatory statements, Ms. Gregory "filed a formal concern on

behalf of Ms. Beckford with Anthem's Ethics & Compliance department and Anthem's

Associate Relations department." (Gregory Decl. ¶ 12; Gregory Decl. Ex. 3; Pl. Dep., at 74:19–

75:22.) This prompted an investigation led by "an investigator with Associate Relations."

(Gregory Decl. ¶ 12.) Later, in early March 2020, Ms. Gregory "learned that Ms. Ayers had

apparently talked to two other employees (Bonnie Taylor and Kim Williams) about the

investigation." (Gregory Decl. ¶ 16.) Ms. Gregory then filed a second formal complaint with

---

[24] As articulated above, Ms. Beckford argues in her Opposition that although at the time she "*thought* [Ms.] Gregory was handling things well" and Ms. Gregory "made her *feel* like she was supportive, in truth, that was deceptive as she was not supportive once one looks under the surface of the statements made." (ECF No. 51, at 6 (emphasis in original).) This argument is not supported by the record and does not create a material dispute. *See Kanu*, 672 F.Supp.3d at 116–17 ("[i]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of two conflicting versions of a party's testimony is correct.") (brackets in original) (citation and quotation marks omitted). Although Ms. Gregory did not file a third formal complaint, this does not indicate a lack of support. By the time any third complaint had arrived, Ms. Beckford was already in close contact with Mr. Jackson and was reporting to him directly. Ms. Gregory was aware of this, and was participating in the investigation. (*See, e.g.*, Gregory Decl. ¶ 14.) Second, Ms. Gregory offered to help Ms. Beckford find other roles. (*See, e.g.*, Pl. Dep. Ex. 18, at 1.) Ms. Gregory gave a positive enough recommendation to Mr. Gentry that he ultimately hired Ms. Beckford. (ECF No. 50-4 ("Gentry Decl.") ¶ 4; Gregory Decl. ¶ 34.) Third, the fact that Ms. Gregory did not proactively move Ms. Beckford's desk to be further from Ms. Ayers does not rise anywhere near an adverse action, and does not indicate that Ms. Gregory was not supportive of Ms. Beckford. As noted above, after Ms. Beckford herself requested to move her desk, Ms. Gregory "immediately approved" this request. (Gregory Decl. ¶ 13; Gregory Decl. Ex. 5, at 1.)

Anthem's Associate Relations department out of concern that Ms. Ayers was retaliating against Ms. Beckford in response to the First Investigation. (Gregory Decl. ¶ 16; Gregory Decl. Ex. 7, at 1; Pl. Dep. at 142:9–144:9.) Ms. Gregory's decision to file even just two formal complaints[25] on Ms. Beckford's behalf in response to her complaints about Ms. Ayers does not support an inference that Ms. Gregory later terminated Ms. Beckford because of these same complaints.[26]

Moreover, this record, even read favorably to Ms. Beckford, fails to create a genuine dispute of material fact that Ms. Gregory was motivated by racial or retaliatory animus when choosing Ms. Beckford to be subject to the RIF. For example, in a March 11, 2020 email from Ms. Beckford to Ms. Gregory, Ms. Beckford wrote: "You have been so wonderful during this entire ordeal and you are not only a good person but a great leader." (Pl. Dep. Ex. 18, at 2.) In response, Ms. Gregory wrote:

> I absolutely want to support you to find the best role/team here at Anthem – even if that means it's not on my team. . . . If I hear of any open positions, I will pass them along to you. And I wish you nothing but the best and future success. I hope it's here with me, but I will support you either way.

---

[25] As articulated above, although Ms. Gregory did not file a third formal complaint, this does not indicate a lack of support. By the time any third complaint had arrived, Ms. Beckford was already in close contact with Mr. Jackson and was reporting to him directly. Ms. Gregory was aware of this, and was participating in the investigation. (*See, e.g.*, Gregory Decl. ¶ 14.)

[26] Ms. Beckford argues in her Opposition that "[t]he close timing between her complaints and [her termination] suggests a retaliatory intent . . . . While [her] complaints began in January of 2020, she continued to make complaints up until the time she was given notice of her termination." (ECF No. 51, at 22–23.)

Fatal to this argument, "timing alone generally cannot defeat summary judgment once an employer has offered a convincing, non[-]retaliatory explanation." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 79 (4th Cir. 2016). Here, no genuine dispute exists showing that Ms. Beckford was selected for termination as part of a RIF, and not for an improper reason. Ms. Gregory identified multiple reasons for selecting Ms. Beckford over Ms. Ayers for the RIF, including the reason that at the time of the RIF, Ms. Ayers had worked as an underwriter at Anthem for over fourteen years, while Ms. Beckford had worked there for fewer than two—a fact that remains undisputed. (Gregory Decl. ¶ 23.)

(Pl. Dep. Ex. 18, at 1.)  Approximately six months later, on September 23, 2020, Ms. Beckford

emailed Ms. Gregory letting her know that she was considering interviewing with a different

team at Anthem, and asking for her assistance.  (Pl. Dep., at 159:15–160:21; Pl. Dep. Ex. 22, at

2.)  In response, Ms. Gregory wrote that although she "would be very sad" if Ms. Beckford left

her team, she was nonetheless "happy to help [] in any way" and offered to conduct a mock

interview.  (Pl. Dep. Ex. 22, at 2.)  Ms. Beckford replied warmly, restating her positive opinion

of Ms. Gregory:

> Maria, I really enjoy working with most of my team and I love having you as a
> leader.  I would follow you wherever you decided to go because I do see that you
> have great leadership skills but at the same time you care.  You are just a warm
> person and the bottom line is I like you and you have a great future.  So if I leave
> our team for this opportunity or another, I will always check in with you to see,
> just maybe if you have room for me ☺.

(Pl. Dep. Ex. 22, at 1.)

Ms. Beckford presents insufficient evidence to indicate a causal connection between her

race-related complaints and her termination.  "Clearly [Ms. Beckford] believes that she was

retaliated against, but that alone is insufficient." *Brackman v. Fauquier Cnty.*, 72 F. App'x 887,

894 (4th Cir. 2003).

The mere fact that Ms. Gregory was aware of at least some Ms. Beckford's complaints at

the time she decided to terminate Ms. Beckford's employment is insufficient to establish

causation. *See Graves*, 2011 WL 63696 at *15.

Indeed, the evidence before the Court contradicts an inference of a causal connection.

After Ms. Beckford raised complaints regarding Ms. Ayers's discriminatory behavior, Ms.

Gregory filed two complaints on Ms. Beckford's behalf and Ms. Beckford praised Ms. Gregory's

leadership.

34

Ms. Beckford argues in her Opposition that although at the time she *"thought* [Ms.] Gregory was handling things well" and Ms. Gregory "made her *feel* like she was supportive, in truth, that was deceptive as she was not supportive once one looks under the surface of the statements made." (ECF No. 51, at 6 (emphasis in original).)  Even read favorably and drawing all reasonable inferences in Ms. Beckford's favor, any suggested deception is not supported by the record and does not create a material dispute.  Ms. Beckford points to the fact that Ms. Gregory did not file a Third Complaint and that she did not help move Ms. Beckford's desk when the friction between Ms. Beckford and Ms. Ayers escalated.  But the failure to file a Third Complaint does not raise a reasonable inference of deception.  Indeed, then-existing non-disputed facts establish otherwise.  First, by the time any third complaint had arrived, Ms. Beckford was in close contact with Mr. Jackson and was reporting to him directly.  Ms. Gregory knew of this, and was participating in the investigation. (*See, e.g.*, Gregory Decl. ¶ 14.)  Second, Ms. Gregory offered to help Ms. Beckford find other roles. (*See, e.g.*, Pl. Dep. Ex. 18, at 1.)  Ms. Gregory gave a positive enough recommendation to Mr. Gentry that he ultimately rehired Ms. Beckford at Anthem. (ECF No. 50-4 ("Gentry Decl.") ¶ 4; Gregory Decl. ¶ 34.)  Third, the fact that Ms. Gregory did not proactively move Ms. Beckford's desk to be further from Ms. Ayers does not rise anywhere near an adverse action, and does not indicate that Ms. Gregory was not supportive of Ms. Beckford.  As noted above, after Ms. Beckford herself requested to move her desk, Ms. Gregory "immediately approved" this request. (Gregory Decl. ¶ 13; Gregory Decl. Ex. 5, at 1.)

As a result, Ms. Beckford has failed to show a prima facie case of retaliation, and Counts II, IV, and VI fail as a matter of law.

**C.    Ms. Beckford Does Not Present a Genuine Issue of Material Fact Sufficient to Sustain a Claim of FMLA Interference Against Anthem (Count VIII)**

Finally, Ms. Beckford brings Count VIII under the Family and Medical Leave Act ("FMLA") against Anthem, claiming that the company provided her with inconsistent information about her FMLA eligibility and later improperly denied her FMLA leave.  (ECF No. 1-1, at 83.)  Even viewing the record as a whole and in the light most favorable to Ms. Beckford, the record is bereft of evidence from which a reasonable trier of fact could conclude that Ms. Beckford was eligible for FMLA leave at the time she requested it in September 2021.  Even if the Court were to conclude otherwise (which it does not), Ms. Beckford fails to present any evidence that she was prejudiced by the alleged FMLA interference.  As a result, Count VIII fails as a matter of law.

**1.    Legal Standard:  FMLA Interference**

To prevail on a claim of FMLA interference, a plaintiff must show:  "(1) that he [or she] is entitled to an FMLA benefit; (2) that his [or her] employer interfered with the provision of that benefit; and (3) that the interference caused him [or her] harm." *Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 796 (4th Cir. 2023).  "The FMLA 'provides no relief *unless the employee has been prejudiced* by the violation.'" *Id.* (emphasis in original) (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).  To be entitled to FMLA leave, an employee must have "worked for at least 1,250 hours . . . during the previous 12-month period." *Ruddy v. Bluestream Pro. Serv., LLC*, 444 F. Supp. 3d 697, 715 n.37 (E.D. Va. 2020) (citing 29 U.S.C. § 2611(2)).[27]

---

[27] 29 U.S.C. § 2611(2) provides, in pertinent part:

**(2) Eligible employee**

**(A) In general**

A plaintiff can prove prejudice by showing that as a result of the FMLA interference, the plaintiff: (1) "lost compensation or benefits"; (2) "sustained other monetary losses"; or (3) "suffered some loss in employment status remediable through appropriate equitable relief, such as employment, reinstatement, or promotion." *Ranade v. BT Americas, Inc.*, 581 F. App'x 182, 184 (4th Cir. 2014) (internal quotation marks and citations omitted).

### 2.    Ms. Beckford Has Created No Genuine Dispute as to Whether She Was Eligible for FMLA Leave in September 2021

No genuine dispute exists that Ms. Beckford had not worked at least 1,250 hours at Anthem during the twelve months before she attempted to take FMLA leave on September 29, 2021. Ms. Beckford's last working day at Anthem was on September 29, 2021, when she worked for an unspecified number of hours. (Pl. Dep. 233:11–22; 237:6–238:9.) From September 29, 2020 through March 12, 2021, "Ms. Beckford worked no more than 789 hours." (Gregory Decl. ¶¶ 36–37.) Ms. Beckford's employment with Job No. 1 ended on March 12, 2021. (Gregory Decl. ¶ 3.) Ms. Beckford's employment with Job No. 2 began on July 12, 2021. (Hill Decl. ¶ 5.) From July 12, 2021 through September 28, 2021, "Ms. Beckford worked no more than 417 hours." (Hill Decl. ¶ 10.) In other words, from September 29, 2020 through September 28, 2021, Ms. Beckford worked *no more* than 1,206 hours.

---

The term "eligible employee" means an employee who has been employed—

  (i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and

  (ii) for at least 1,250 hours of service with such employer during the previous 12-month period.

29 U.S.C. § 2611(2)(A)(i)–(ii).

In her Opposition, Ms. Beckford attempts to dispute the fact that she did not work the requisite 1,250 hours in the twelve months preceding September 29, 2020. (ECF No. 51, at 14 (citing ECF No. 51-1, at 9–10 ¶¶ 24, 28 ("Pl. Decl.").) Ms. Beckford fails, however, to present any admissible evidence rebutting Anthem's evidence that she did not work the requisite 1,250 hours. *See Kanu*, 672 F.Supp.3d at 116–17 ("[i]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of two conflicting versions of a party's testimony is correct.") (brackets in original) (citation and quotation marks omitted). It remains undisputed that Anthem informed Ms. Beckford that its notices stating that Ms. Beckford worked more than the requisite 1,250 hours were caused by computer errors. (*See* Pl. Dep., at 264:6–265:5; Pl. Dep. Ex. 57, at 1; Mock Decl. ¶¶ 4, 6.)

This is especially true given that at her deposition, Ms. Beckford conceded that despite initially stating that "[Anthem's] check stub has the hours on there", the pay stub she produced fails to reflect that she worked at least 1,250 hours. (ECF No. 52-5 ("Pl. Dep. Second Excerpt"), at 270:6–273:11.) Ms. Beckford also testified that she used both a calendar (which she conceded she no longer possesses) and a Word document to track her hours. (Pl. Dep. Second Excerpt, at 189:8–194:16.) After her deposition, Ms. Beckford's counsel wrote in an email to Anthem's counsel that he was unable to locate "[a]ny notes, records, calendars, or calculations of the hours Ms. Beckford worked during her employment with Anthem (including but not limited to the 'Word document' she described in her deposition)." (ECF No. 52-6, at 1.) As such, Ms. Beckford fails to create a genuine dispute as to this issue, and this claim must fail as a matter of law.

**3.    Ms. Beckford Has Created No Genuine Dispute as to Whether She Was Prejudiced by the Denial of FMLA Leave**

Even if the Court were to conclude that Ms. Beckford had worked the requisite number of

hours (which it does not), Ms. Beckford does not succeed in identifying any evidence that she

was prejudiced by Anthem's denial of FMLA leave.  In her Opposition, she contends that

Anthem's denial caused her "significant stress and contributed to her emotional suffering and to

her abandonment of any faith in [Anthem] and its claimed commitment to its CORE values."

(ECF No. 51, at 27.)  She cites to no legal authority supporting the proposition that emotional

harm is sufficient to make the requisite showing of prejudice.  (*See* ECF No 51, at 27.)

It remains undisputed that as an Americans with Disabilities Act ("ADA")

accommodation, Anthem ultimately approved Ms. Beckford "for a leave of absence . . . from

October 6, 2021 through January 17, 2022." (Gentry Decl. ¶ 12.)  Because Ms. Beckford's last

working day at Anthem was on September 29, 2021, when she worked for an unspecified

number of hours (Pl. Dep. 233:11–22; 237:6–238:9), Ms. Beckford took approximately 4.5

unapproved business days off from the middle of September 29, 2021 through October 5, 2021.

Ms. Beckford admits that Anthem did not discipline her for these unapproved absences, nor did

her manager Mr. Gentry pressure her to come back or threaten to discipline her due to her taking

leave.  (Pl. Dep., at 283:2–284:4.)[28]

On December 22, 2021, while still on ADA leave, Ms. Beckford resigned from Anthem.

(Pl. Dep. 279:9–280:18, 304:2–18; Hill Decl. ¶ 11.)  As a result of her FMLA denial, Ms.

Beckford took approximately 4.5 unapproved business days off from the middle of September

29, 2021 through October 5, 2021. Ms. Beckford concedes that she was not financially harmed

---

[28] Like FMLA leave, leave under the ADA is unpaid, (Mock Decl. ¶ 6), meaning that Ms. Beckford cannot (and does not) claim economic harm.

by Anthem's misstatements regarding her leave eligibility, nor by Anthem's denial of her FMLA leave requests. (Pl. Dep., at 349:16–350:9 (when asked if she incurred financial harm as a result of these events, Ms. Beckford stated, "[n]ot financial, no", and then confirmed that she did, however, experience stress).)

Ms. Beckford fails to identify any evidence supporting even a reasonable inference that as a result of her FMLA denial, she (1) "lost compensation or benefits"; (2) "sustained other monetary losses"; or (3) "suffered some loss in employment status remediable through appropriate equitable relief, such as employment, reinstatement, or promotion." *Ranade*, 581 F. App'x at 184. More broadly, she fails to identify any evidence showing how she was otherwise prejudiced by the FMLA denial beyond possible emotional harm. As a result, even if she had successfully shown that she were eligible for FMLA leave at the time she attempted to take it, her FMLA interference claim nonetheless could not survive.

### D. Ms. Beckford Cannot Rebut Anthem's Legitimate Business Reasons for Terminating Her Employment in the RIF

For the reasons discussed above, Ms. Beckford fails to establish a prima facie case for her discrimination claims or her retaliation claims because she cannot show that her termination in the RIF was racially discriminatory, and cannot show a causal connection between her complaints about Ms. Ayers and her termination in the RIF. Even if the Court were to conclude otherwise (which it does not), these claims would still founder because Ms. Beckford fails to rebut Anthem's legitimate business reasons for terminating her employment in the RIF. The undisputed evidence shows that legitimate business reasons explain why Ms. Beckford was selected to be laid off as a result of the RIF.

Ms. Gregory chose to terminate Ms. Beckford's (rather than Ms. Ayers') employment for four reasons. (Gregory Decl. ¶¶ 22–26.) First, Ms. Ayers had worked as an underwriter at

Anthem for over fourteen years, while Ms. Beckford had worked there for fewer than two. (Gregory Decl. ¶ 23.)  Given this, "Ms. Ayers had a much greater breadth and depth of knowledge of the requirements of the job and handled a wider range of issues." (Gregory Decl. ¶ 23.)  Second, although Ms. Gregory did not believe that Ms. Beckford "was a poor performer", her "performance simply was not as good as Ms. Ayers'[s] performance over the 2019-2020 period." (Gregory Decl. ¶ 24.)  Third, Ms. Ayers had more experience than Ms. Beckford with the administrative, non-underwriting tasks involved in account renewals, which made her a more suitable backup for the employee assigned to such tasks for the Virginia Accounts team. (Gregory Decl. ¶¶ 9, 25.)

Fourth and finally, Ms. Gregory concluded that "Ms. Ayers would be better able to handle the increased volume of work that the one remaining underwriter would be expected to handle after the elimination of the other underwriter position." (Gregory Decl. ¶ 26.)  In reaching this conclusion, Ms. Gregory noted that Ms. Ayers had successfully served as the only underwriter for all of Virginia for approximately four months prior to Ms. Beckford's hiring. (Gregory Decl. ¶¶ 8, 26.)  In contrast, Ms. Beckford "at times struggl[ed] to keep up with the volume of underwriting work for her half of the [Commonwealth]". (Gregory Decl. ¶ 26.)  Ms. Gregory received complaints about Ms. Beckford's slower turnaround times and spoke to her several times to address her being "behind in her work." (Gregory Decl. ¶ 26; Gregory Decl. Ex. 17, at 2; Gregory Decl. Ex. 18, at 1.)

Ms. Beckford fails to adduce any evidence to rebut these legitimate, non-discriminatory reasons.  As the Fourth Circuit has explained, terminating an employee because the employee "does not have sufficient experience in the area most important to the present and future needs of

the company is a legitimate, nondiscriminatory reason for termination." *Fields v. Verizon Servs. Corp.*, 493 F.App'x 371, 376 (4th Cir. 2012).

Moreover, Ms. Beckford fails to adduce evidence showing that these reasons were pretextual. When the same person both hires and fires a plaintiff, "'a powerful inference [arises] that the [action] was not motivated by discriminatory animus." *Smyth-Riding v. Sciences & Eng'g Servs., LLC*, 699 F.App'x 146, 157–58 (4th Cir. 2017) (brackets in original) (quoting *Evans*, 80 F.3d at 959); *see also Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer, and the early resolution of this question need not be derailed by strict fealty to proof schemes." (citation omitted)). "This is so because 'employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.'" *Smyth-Riding*, 699 F.App'x at 158 (quoting *Proud*, 945 F.2d at 798). Ms. Gregory not only willingly hired Ms. Beckford in the first instance, post-RIF, she recommended Ms. Beckford for another job in Anthem at an hourly rate 13% *greater* than Ms. Beckford has been earning in Job No. 1. Ms. Beckford utterly fails to rebut this "powerful inference" because she fails to provide any evidence allowing for the reasonable inference that Ms. Gregory harbored racial animus against Ms. Beckford.

### IV. Conclusion

Viewing the record as a whole and in the light most favorable to Ms. Beckford, Ms. Beckford has failed to adduce evidence that would create a genuine dispute of a material fact regarding her claims for race discrimination, (Counts I, III, and V), retaliation, (Counts II, IV, and VI), and interference in violation of the FMLA, (Count VIII). Were the Court to presume a

prima facie case, Ms. Beckford would fail to establish pretext.  For the foregoing reasons, the Court will grant the Amended Motion for Summary Judgment.  (ECF No. 49.)

     An appropriate order shall issue.

Date: 3/28/25
Richmond, Virginia

_____
/s/
M. Hannah Lauck
United States District Judge

43